IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee,*

*v.*

BRIAN MATTHEW MACHARDY,
*Appellant.*

No. 2 CA-CR 2021-0021
Filed November 10, 2022

---

Appeal from the Superior Court in Pima County
No. CR20193847001
The Honorable Kimberly H. Ortiz, Judge

**AFFIRMED**

---

COUNSEL

Mark Brnovich, Arizona Attorney General
Linley Wilson, Deputy Solicitor General/Section Chief of Criminal Appeals
By Jacob R. Lines, Assistant Attorney General, Tucson
*Counsel for Appellee*

Apfel Law Group, Phoenix
By Seth Apfel
*Counsel for Appellant*

**OPINION**

Chief Judge Vásquez authored the opinion of the Court, in which Judge Staring concurred and Presiding Judge Eckerstrom concurred in part and dissented in part.

V Á S Q U E Z, Chief Judge:

**¶1**     Brian MacHardy appeals his convictions and sentences for nine counts of sexual exploitation of a minor. He argues law enforcement illegally searched his computer, the trial court erred by denying his motion to suppress, and the state failed to present sufficient evidence that actual minors were depicted in the materials he possessed. He also contends the court improperly enhanced his sentences and challenges the sufficiency of his waiver of a jury trial. For the following reasons, we affirm.

### Factual and Procedural Background

**¶2**     We view the facts in the light most favorable to sustaining the jury's verdicts. *See State v. Brock*, 248 Ariz. 583, ¶ 3 (App. 2020). In August 2019, MacHardy was indicted on nine counts of sexual exploitation of a minor, each a dangerous crime against children. The indictment alleged that between May 2017 and April 2018, MacHardy had knowingly downloaded, possessed, or electronically transmitted visual depictions of a minor under the age of fifteen engaged in an exploitative sexual act, a class two felony under A.R.S. § 13-3553(A)(2), (C).

**¶3**     After a bench trial, MacHardy was convicted as charged. The trial court sentenced him to nine ten-year terms of imprisonment, with all counts running consecutively, as required by A.R.S. § 13-705(N). This timely appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

### Warrantless "Search" of MacHardy's Files

**¶4**     In September 2017, Dan Barry, a detective in the Internet Crimes Against Children section of the Tucson Police Department, used software to monitor the unlawful transfer of previously identified child sexual abuse files over BitTorrent, a peer-to-peer file sharing network. The software identified thirty-one suspicious videos and partial videos originating from a single internet protocol (IP) address for which

MacHardy was the subscriber. The subsequent search of MacHardy's residence, conducted pursuant to a search warrant, and police interview with MacHardy led to his indictment.

¶5          At the hearing on MacHardy's motion to suppress, Detective Barry, the only digital forensic analyst who testified regarding the investigative software, offered testimony that was ambiguous as to whether the software searched MacHardy's entire computer or was restricted to searching only files MacHardy had shared on BitTorrent. Perhaps as a result, the trial court did not make a clear finding regarding what the software had searched.

¶6          MacHardy argues, for the first time on appeal, that officers violated his right to privacy as protected by the Fourth Amendment to the United States Constitution and article II, § 8 of the Arizona Constitution when they operated the software "not available to the general public to conduct a warrantless search of [his] computer" that identified him as possessing sexually exploitative files. Specifically, he argues the software conducted a search of his entire "computer," rather than only files he affirmatively shared on BitTorrent. And because the search of his computer was "accomplished using technology not available to the general public," he contends *Kyllo v. United States*, 533 U.S. 27 (2001), controls the issue.[1] Because MacHardy did not raise this issue with the trial court, we review only for fundamental, prejudicial error. *State v. Escalante*, 245 Ariz. 135, ¶ 12 (2018).

¶7          If, as MacHardy argues, the software searched the entire contents of his computer, rather than just the files located in a shared folder, such a search would arguably require a warrant under our state and federal constitutions. *See Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (privacy expectation extends beyond physical movements and encompasses record of those movements as captured through cell-site location information); *Minnesota v. Olson*, 495 U.S. 91, 95-96 (1990) (subjective privacy expectation legitimate if society prepared to recognize expectation as reasonable); *State v. Ault*, 150 Ariz. 459, 466 (1986) (Arizona's constitution is "specific in preserving the sanctity of homes and in creating

---

[1]In *Kyllo*, the Supreme Court determined that the warrantless use of "sense-enhancing technology" to gather "any information regarding the interior of the home that could not otherwise have been obtained without physical" intrusion into a home constituted a search, "at least where . . . the technology in question is not in general public use." 533 U.S. at 34.

a right of privacy."). However, as MacHardy concedes, warrantless searches into content shared on peer-to-peer networks are constitutionally permissible because "by knowingly using a file sharing network," users maintain "no reasonable expectation of privacy in the files accessible on that network." *State v. Welch*, 236 Ariz. 308, ¶¶ 9-11 (App. 2014); *see also State v. Mixton*, 250 Ariz. 282, ¶ 14 (2021) (IP address and internet service provider subscriber information voluntarily disclosed to third parties have "no expectation of privacy"); *see also United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008) (individual's reasonable expectation of privacy in personal computer does not survive "decision to install and use file-sharing software" when user "explicitly warned before completing the installation that the folder into which files are downloaded would be shared with other users in the peer-to-peer network").

¶8        Here, because MacHardy failed to object or otherwise clarify the extent of the investigative software's reach, the record before us is inconclusive and inadequately developed on this central factual issue. Thus, MacHardy has not satisfied the first step in fundamental error analysis—demonstrating that trial error occurred. *See State v. Henderson*, 210 Ariz. 561, ¶¶ 19-20 (2005); *Escalante*, 245 Ariz. 135, ¶ 13. It is not our role as a reviewing court to make factual findings. *See State v. Klos*, 248 Ariz. 40, ¶ 10 (App. 2019). We therefore conclude MacHardy has failed to meet his burden under *Escalante* and *Henderson* to establish fundamental error.

### Warrantless In-Home Arrest

¶9        MacHardy also argues the trial court erroneously declined to suppress statements he made during an interview following what he characterizes as a warrantless arrest inside his home in April 2018. On the morning of MacHardy's arrest, the United States Marshals Service served a search warrant on MacHardy's residence. They detained MacHardy, "placed him in handcuffs, and removed him from the second-floor apartment." Detective Barry testified this was "normal practice for officer safety during executions of search warrants." While the Marshals "secured" the residence, MacHardy "remained handcuffed and detained at the first-floor landing of the stairwell away from the apartment." When Detective Barry asked if he was willing to talk, MacHardy agreed. Detective Barry took him to a police vehicle—a reformatted city bus—with an enclosed interview area equipped with a padded bench and a table and read him his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). MacHardy sat there, still handcuffed, for the duration of the interview, which lasted less than an hour. During the interview, MacHardy made

several incriminating statements, including admitting to possessing images and videos of "prepubescent" children engaged in sexual acts with adults.

**¶10** MacHardy moved to suppress these statements, but he specifically noted that the initial in-home detention was "perfectly valid" and did not transform into an illegal arrest until sometime after he was removed from his residence. On appeal, MacHardy notes "the trial court's ruling is unclear as to precisely when arrest occurred, finding only that [he] was under arrest at the time he provided his statement" on the bus. He also argues the arrest lacked probable cause and illegally occurred "inside his home," where the Marshals had "handcuffed him and forcibly removed him, taking him down the stairs from his apartment to another area, where he remained handcuffed and detained." Although parties' arguments may evolve, to some extent, on appeal, *see Yee v. City of Escondido*, 503 U.S. 519, 534 (1992), MacHardy's argument that the initial detention was improper because it constituted an arrest inside his apartment directly contradicts the position he took before the trial court. As a result, the factual predicate for his argument on appeal that the detention inside his apartment was improper was not developed. Therefore, that component of MacHardy's argument is forfeited, and we address it only for fundamental, prejudicial error. *See Escalante*, 245 Ariz. 135, ¶ 12; *Henderson*, 210 Ariz. 561, ¶ 19.

**¶11** "Whether a probable cause determination comports with the Fourth Amendment is a mixed question of law and fact that we review de novo." *State v. Morris*, 246 Ariz. 154, ¶ 10 (App. 2019). However, we defer to the trial court's factual findings, "including whether witnesses were credible and whether the inferences drawn by a police officer were reasonable." *Id.*

**¶12** MacHardy has shown no error. Probable cause for a warrantless arrest exists if "the facts and circumstances within the knowledge of the arresting officer at the time were sufficient to warrant a man [or woman] of reasonable caution to believe that a felony had been committed by the person arrested." *State v. Edwards*, 111 Ariz. 357, 360 (1974); *see also* A.R.S. § 13-3883(A)(1). This standard is one of probability or substantial likelihood, not certainty, and "depends on the totality of the circumstances." *State v. Sisco*, 239 Ariz. 532, ¶ 8 (2016); *Morris*, 246 Ariz. 154, ¶ 9 ("Probable cause is something less than the proof needed to convict and something more than suspicions." (quoting *State v. Aleman*, 210 Ariz. 232, ¶ 15 (App. 2005))).

**¶13** As the trial court reasoned, by the time police had obtained a search warrant for MacHardy's residence, they knew that an IP address

tethered to MacHardy's subscriber information had accessed illegal child sexual abuse materials seven months before the arrest, that MacHardy lived alone, and that no open wireless networks existed near his apartment. These facts provided probable cause to believe a crime had been committed and that MacHardy had committed it. *See Edwards*, 111 Ariz. at 360. We further agree with the trial court that police did not require proof beyond a reasonable doubt that MacHardy's conduct was knowing—an element of the offense of sexual exploitation of a minor, *see* § 13-3553(A)—to meet the probable cause standard. *See, e.g.*, *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (standard of proof necessary to establish probable cause "'means less than evidence which would justify' . . . conviction" (quoting *Locke v. United States*, 11 U.S. 339, 344 (1813))). Rather, as the court noted, sufficient intent could be inferred "by the number of partial videos—31—that were single source downloaded over nearly 7 hours."

¶14      For the first time on appeal, MacHardy argues that, even if probable cause supported his arrest, it was still illegal because officers arrested him inside his apartment without an arrest warrant. He contends his inculpatory statements should therefore have been suppressed as improperly obtained. In support of this argument, MacHardy cites only *Ault*, 150 Ariz. 459. That case concluded that the seizure of incriminating evidence was unlawful because it had been obtained through officers' warrantless entry into a suspect's home and subsequent warrantless arrest of that suspect. *Id.* at 463-64. MacHardy correctly notes that our state constitution may provide a heightened standard of privacy as compared with our federal constitution, "at least in the context of physical intrusions into a home." *State v. Hausner*, 230 Ariz. 60, ¶ 41 (2012).

¶15      But here, unlike the facts in *Ault*, officers possessed a valid warrant for the search of MacHardy's home in the first instance—a non-trivial distinction in the context of case precedent focused on home privacy. And, as MacHardy acknowledged at the suppression hearing, officers do not violate the United States Constitution by detaining the occupant of a residence to execute a valid search warrant. *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *see also Bailey v. United States*, 568 U.S. 186, 199-201 (2013) (reiterating permissibility of "detention of occupants *on the premises* during the execution of a search warrant," so long as detention limited "to the immediate vicinity of a premises to be searched" (emphasis added)). This is a principle our Arizona courts have affirmed—even when police lack probable cause to arrest a suspect at the time of the initial detention. *See State v. Miller*, 186 Ariz. 314, 320 (1996) ("issuance of the search warrant authorized" police to detain suspect "while the warrant was being executed," even without probable cause).

¶16 Moreover, we are unconvinced that MacHardy's detention evolved into an illegal arrest. As the trial court reasoned, MacHardy was under arrest by the time he sat in the police bus and made statements to Detective Barry. *See State v. Winegar*, 147 Ariz. 440, 447-48 (1985) ("arrest is complete when the suspect's liberty of movement is interrupted and restricted by the police," which "turns upon an evaluation of all the surrounding circumstances to determine whether a reasonable person, innocent of any crime, would reasonably believe" he or she was being arrested). However, police had probable cause to arrest MacHardy by that time. In fact, based on facts supporting the search warrant discussed above, police had probable cause to arrest MacHardy at the time they initially detained him, given that they learned no new facts to further support probable cause between that detention and the bus interview. To the extent *Ault* informs this issue, it suggests in the context of a home, the Arizona Constitution is more protective of privacy interests than the United States Constitution. MacHardy has not explained why that case, or the more specific privacy language of the Arizona Constitution, also requires elevated protection for a person's liberty interests upon arrest and detention. Nor has MacHardy explained how a valid detention pursuant to issuance of a search warrant becomes an illegal arrest merely because the detention eventually leads to arrest. Thus, we conclude that MacHardy has not established any error, much less fundamental error, in the court's admission of his statements made following his detention and arrest.

## Voluntariness of Jury Trial Waiver

¶17 In March 2020, MacHardy's jury trial set for the following month was vacated due to the statewide emergency caused by "the spread of COVID-19 in the general population." Two months later, the parties filed a trial memorandum confirming their agreement to a bench trial. On appeal, MacHardy argues his jury trial waiver "was insufficient because the trial court failed to assess whether that waiver was voluntary, thereby committing structural error." We review a trial court's determination regarding a defendant's waiver of a jury trial for an abuse of discretion. *State v. Muhammad*, 253 Ariz. 371, ¶ 21 (2022). Whether waiver was voluntary depends on "the unique circumstances of each case." *State v. Butrick*, 113 Ariz. 563, 566 (1976). We defer to the trial court's factual findings that are supported by the record and not clearly erroneous, *State v. Moore*, 222 Ariz. 1, ¶ 17 (2009), and we "presume that a court is aware of the relevant law and applies it correctly in arriving at its rulings," *State v. Moody*, 208 Ariz. 424, ¶ 53 (2004).

**¶18** The right to a jury trial is protected by both the United States Constitution and the Arizona Constitution. U.S. Const. amend. VI; Ariz. Const. art. II, §§ 23, 24; *id.* art. VI, § 17. Under our criminal rules, a defendant's waiver of that right "must be in writing or on the record in open court." Ariz. R. Crim. P. 18.1(b)(3); *accord* Ariz. R. Crim. P. 41, Form 20 ("Waiver of Trial by Jury (Non-Capital)"). And the trial court "must address the defendant personally, inform the defendant of the defendant's right to a jury trial, and determine that the defendant's waiver is knowing, voluntary, and intelligent." Ariz. R. Crim. P. 18.1(b)(2); *see also State v. Innes*, 227 Ariz. 545, ¶ 5 (App. 2011) ("A defendant's waiver of his or her right to a jury must be given knowingly, voluntarily and intelligently.").

**¶19** In this case, the trial court complied with the requirements of Rule 18.1(b) in determining that MacHardy had knowingly, intelligently, and voluntarily agreed to a bench trial. MacHardy both signed a written waiver and twice confirmed his decision on the record in open court to waive his right to a jury trial, as required by Rule 18.1(b)(1), and the court twice personally addressed MacHardy and informed him of his right to a jury trial, as required by Rule 18.1(b)(2). Indeed, the record reflects that, over a five-month period, MacHardy repeatedly agreed to proceed with a bench trial in writing and when asked in person by the court.

**¶20** In May 2020, MacHardy and the state filed a joint trial memorandum that indicated MacHardy was "willing" to proceed with a bench trial. At a status conference the next month, the state reiterated that the parties had agreed to a bench trial and requested to "officially put on the record that [MacHardy was] waiving his jury trial right." The trial court explained to MacHardy that his attorney had said MacHardy was "willing to have a bench trial, meaning that [he] would try [his] case to the Court and not to a jury." When the court asked if this is what he had agreed to, MacHardy responded, "Yes, I have." The court explained that "[w]hen you have a bench trial to the Court we don't convene a jury, we don't select jurors, all the evidence is tried to the Court" and asked whether MacHardy was "all right with that," to which he responded, "Yes I am." The court further observed that the state still had the "burden to prove the charges beyond a reasonable doubt" and that MacHardy would retain the rights associated with a jury trial, including the right to remain silent, have his attorney represent him, confront and cross-examine the state's witnesses, present evidence on his behalf, and subpoena witnesses for his defense, but that he would be giving up the right to have a jury decide whether aggravating factors had been proven. The court again asked MacHardy if he was "all right with that," and he responded, "Yes I am." The court then set the matter for a bench trial.

¶21 In September 2020, a week before trial, MacHardy signed a written waiver stating the following:

> I understand I am charged with the crime of sexual exploitation of a minor, . . . a . . . felony and that, if I am found guilty, I can be given a . . . prison sentence and be required to pay a fine . . . .

> I understand I am entitled to a trial by jury on these charges which means the right to have my guilt or innocence decided by a group of ordinary people whose decision must be unanimous. Once I have made the decision to give up my right to a jury trial, I may change my mind only with the court's permission and may not change it at all once the trial has actually begun.

The form concluded with MacHardy's avowal: "After reading and understanding the above, I hereby give up my right to trial by jury and *consent* to have my guilt or innocence determined by the judge." (Emphasis added.) The form included a certification by defense counsel, signed the day before trial, that he had explained to MacHardy "his right to trial by jury," as well as consent to the waiver by said counsel and the prosecutor.

¶22 On the first day of trial, MacHardy's counsel submitted the signed waiver form to the court. The court once again personally addressed MacHardy, who confirmed he had signed and dated the form. The court recited the contents of the form, stopping periodically to confirm that MacHardy understood it and had no questions.[2] The court signed the form, and its minute entry memorializes that the court "informally question[ed MacHardy] regarding the Waiver of Trial by Jury" and found that MacHardy "knowingly, intelligently, and voluntarily waives his right to a trial by jury."

¶23 MacHardy nevertheless contends the trial court's colloquy and the signed waiver form were "inadequate" because neither expressly asked "about coercion of any kind, or promises, or whether [he] was under

---

[2]The trial court departed from the form in one respect, noting that MacHardy had been charged with nine counts of sexual exploitation of a minor.

the influence" or otherwise "pressured to waive a jury trial given the fact that very few jury trials were proceeding at the time due to Covid." But nothing in either Rule 18.1(b) or our caselaw interpreting that rule requires that specific inquiry, and we will not read such a requirement into the rule. *See Roberts v. State*, 253 Ariz. 259, ¶ 20 (2022) (courts will not "read into a statute something which is not within the manifest intention of the legislature as gathered from the statute itself" or "inflate, expand, stretch or extend a statute to matters not falling within its expressed provisions" (quoting *City of Phoenix v. Donofrio*, 99 Ariz. 130, 133 (1965))); *State v. Simon*, 229 Ariz. 60, ¶ 7 (App. 2012) (applying principles of statutory construction when interpreting rules of procedure, looking to plain language of rule as best and most reliable index of its meaning).

¶24 As outlined above, the rule only requires that the trial court, after addressing the defendant personally and informing him of his right to a jury trial, "determine" the waiver is, among other things, voluntary, Ariz. R. Crim. P. 18.1(b)(2), based on "the unique circumstances of each case," *Butrick*, 113 Ariz. at 566. MacHardy has not provided any authority supporting his proposition that the court's failure to ask certain questions constitutes error, nor has he challenged the constitutionality of Rule 18.1. Nevertheless, our supreme court has recently addressed the validity of a defendant's waiver of a jury trial and reiterated that "the procedures in Rule 18.1(b) are appropriate and adequate." *Muhammad*, 253 Ariz. 371, ¶ 23.

¶25 To the extent MacHardy suggests that a trial court must engage in the same colloquy as it would with a defendant pleading guilty, our supreme court has rejected that view, stating, "Defendants waiving only the right to a jury trial need not be afforded the exact procedural protections provided to those whom we treat . . . as if they were pleading guilty." *State v. Conroy*, 168 Ariz. 373, 375 (1991). We recognize that in several cases in which our supreme court upheld a defendant's jury trial waiver, the trial court asked the defendant specific questions informing the voluntariness inquiry, including whether his waiver was a product of coercion, threats, or promises. *See Muhammad*, 253 Ariz. 371, ¶ 14; *Conroy*, 168 Ariz. at 373; *Butrick*, 113 Ariz. at 565. While those cases provide examples of colloquies deemed sufficient—and perhaps represent a better practice—nothing in them requires such questioning to buttress a finding of voluntary waiver. *See Muhammad*, 253 Ariz. 371; *Conroy*, 168 Ariz. 373; *Butrick*, 113 Ariz. 563.

**¶26**          Contrary to MacHardy's assertion that the record is "silent" regarding whether his waiver was voluntary,[3] the trial court personally addressed MacHardy and explicitly found his waiver voluntary, and that finding is supported by the record. *See State v. Little*, 104 Ariz. 479, 481 (1969) (validity of waiver depends on unique circumstances of each case, including extent trial court discussed matter with defendant, whether defendant had assistance of counsel at time of waiver, and existence of evidence that defendant's decision "was not the result of a free and intelligent choice on his part"). Nothing in the record supports MacHardy's assertion that he was "pressured to waive a jury trial given the fact that very few jury trials were proceeding at the time due to Covid, and courts and prosecutorial offices throughout the state were looking to move cases to reduce backlog." To the contrary, at the June status conference, the court noted that it was aware the parties had agreed to a bench trial, but it added, "Currently the court does not have the ability to set trials yet, it is still in the process [of] being approved by the Health Department." Likewise, there is nothing in the record to suggest the state was pressuring MacHardy to agree to a bench trial.

**¶27**          MacHardy was assisted by counsel each time waiver was discussed, and counsel avowed that he had explained to MacHardy his right to a jury trial and MacHardy had consented to his waiver of it. Additionally, while not alone determinative, MacHardy never indicated to the trial court that his waiver was anything but voluntary, nor does he make such an argument on appeal. The court, in communicating with the parties and lawyers, also had the opportunity to observe MacHardy's demeanor and detect and assess any credibility concerns arising from MacHardy's answers, but none arose. *See Winegar*, 147 Ariz. at 445. In sum, the procedure followed by the court here was sufficient, and the record supports the court's determination that MacHardy voluntarily waived his

---

[3]In *State v. Baker*, we vacated the defendant's convictions based on a "silent record" in which the trial court failed to comply with Rule 18.1 and the relevant transcripts contained "no discussion of waiver or any indication that [the defendant] was informed of his right to have his guilt or innocence decided by a jury." 217 Ariz. 118, ¶¶ 11, 15 (App. 2007). The record was similarly barren in *State v. Becerra*, 231 Ariz. 200, ¶¶ 14-15 (App. 2013), and *Innes*, 227 Ariz. 545, ¶ 8. In contrast, as we have noted, the trial court here complied with Rule 18.1, by personally addressing MacHardy twice in open court regarding his waiver and accepting the pretrial memorandum and written waiver form consenting to a bench trial.

right to a jury trial. Thus, there was no error, structural or otherwise, regarding MacHardy's waiver.

## Sufficiency of Actual Minor Evidence

¶28 MacHardy also argues the state failed to present sufficient evidence that actual minors were depicted in the relevant images rather than adults appearing to be minors, virtually created images of minors, or computer-enhanced images of adults posing as minors. The state counters that "ample evidence supports the element that the images contain actual, rather than virtual, children." We agree with the state that on the record before us, and in light of settled law in jurisdictions that have considered this issue, the state's evidence was sufficient to support MacHardy's convictions.

¶29 We review de novo whether sufficient evidence supports a conviction. *State v. West*, 226 Ariz. 559, ¶ 15 (2011). Viewing the evidence in the light most favorable to sustaining the verdict, and resolving all inferences against the defendant, we must determine whether the state presented evidence that "reasonable persons could accept as sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *State v. Spears*, 184 Ariz. 277, 290 (1996). This standard extends to every essential element of the offenses charged. *See Prosise v. Kottke*, 249 Ariz. 75, ¶ 21 (App. 2020). In evaluating the sufficiency of the state's evidence, we may not "reweigh evidence or reassess the witnesses' credibility." *State v. Buccheri-Bianca*, 233 Ariz. 324, ¶ 38 (App. 2013). If jurors could reasonably differ as to whether the evidence establishes the necessary facts, that evidence is sufficient as a matter of law. *See State v. Davolt*, 207 Ariz. 191, ¶ 87 (2004).

¶30 MacHardy was charged with nine counts of sexual exploitation of a minor under § 13-3553(A)(2). As pertinent here, that section provides that "[a] person commits sexual exploitation of a minor by knowingly . . . [d]istributing, . . . receiving, . . . electronically transmitting, possessing or exchanging any visual depiction in which a minor is engaged in exploitive exhibition or other sexual conduct." *Id.*

¶31 In 2002, the United States Supreme Court held that federal statutes prohibiting sexually explicit images appearing to depict minors, but produced without using actual children, ran afoul of the First Amendment's free speech protection. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 256-58 (2002). The following year, we held that two sections of our state's child pornography statutes, A.R.S. §§ 13-3551, 13-3553, did not make

the same constitutional misstep because "their scope is limited to visual depictions of 'actual minors' actually engaged in real or simulated exploitative exhibition or sexual conduct." *State v. Hazlett*, 205 Ariz. 523, ¶ 7 (App. 2003).[4]

**¶32** Drawing on *Ashcroft* and *Hazlett*, MacHardy argues the state failed to meet its burden to provide sufficient evidence under § 13-3553 because that evidence was based primarily on testimony that the offending images "appear[ed] to" depict minors. Assuming without deciding that *Hazlett* is precedential, *Ashcroft* and *Hazlett* indeed stand for the proposition that a statute cannot punish possession or development of images that do not contain actual minors but merely appear to do so. *See Ashcroft*, 535 U.S. at 241-42; *Hazlett*, 205 Ariz. 523, ¶¶ 11-12. As *Hazlett* made clear, the key distinction is whether an actual child was involved in the production of the images. 205 Ariz. 523, ¶ 17 ("term 'participant' [in § 13-3556] implies the existence of an actual person as opposed to a fictitious character" and demonstrates that legislature's intent in § 13-3553 "was solely to prohibit material using actual minors"). For this reason, we agree the state must present evidence from which a factfinder could make this distinction beyond a reasonable doubt.

**¶33** MacHardy equates Detective Barry's testimony that the people in the images in counts one through five "appear[ed] to be minors" with the unconstitutional inference of § 13-3556 that a participant is a minor if the image "depicts the participant as a minor." But there is a distinction between "depict[ing] the participant as a minor," § 13-3556, and a participant appearing to *actually be* a minor. As *Hazlett* reasoned, § 13-3556 overbroadly allowed a conviction under § 13-3553 based solely on an image's illusion that a participant shown in the image was a minor. 205 Ariz. 523, n.10. So, for example, if an immature-appearing adult was depicted in a manner commonly reserved for children, such as through the use of particular clothing or setting, § 13-3556 allowed the factfinder to infer the individual was a minor, without any further evidence that the participant was, in fact, a child. *See id.*; *see also Ashcroft*, 535 U.S. at 241 (federal statute's provision unconstitutionally overbroad when it impermissibly punished creation of, for example, "movies, filmed without any child actors, if a jury believes an actor 'appears to be' a minor engaging

---

[4]In a footnote, *Hazlett* also concluded A.R.S. § 13-3556 ran afoul of the Supreme Court's decision in *Ashcroft* because it "permit[ted] the trier of fact to convict a person under § 13-3553 even if no actual child was a participant in the depiction or live act." *Hazlett*, 205 Ariz. 523, n.10 (quoting § 13-3556).

in 'actual or simulated . . . sexual intercourse'" (quoting 18 U.S.C. § 2256(8)(B))).

¶34        Here, by contrast, the state did not direct Detective Barry's testimony toward establishing that the images merely depicted the participants as minors. Rather, the state presented his testimony that the participants in the images found on MacHardy's electronic devices "appear[ed] to be" minors to establish that actual minors were used in the production of the images. For example, Barry testified that, based on his training and experience working in the child sexual abuse unit, a victim's approximate age could be identified based on "overall size of the body, development of their teeth, development of breast tissue, pubic hair, . . . [h]ip development," and similar characteristics. He further testified that the participants shown in the images appeared to range in ages from about six to about thirteen. And, Detective Barry testified that at least some of the files MacHardy downloaded on BitTorrent matched "previously identified child sexual abuse files that have been reported to the Internet Crimes Against Children task force by other investigators." This was relevant testimony directed to the central question of whether the persons in the images were actual minors. The factfinder was entitled to determine how much weight to give it.[5] *See Tibbs v. Florida*, 457 U.S. 31, 37-38 (1982) (conviction rests on insufficient evidence when no rational factfinder could have found defendant guilty beyond reasonable doubt, whereas weight of evidence refers to determination by trier of fact that greater amount of credible evidence supports one side than another). It was up to the factfinder to weigh the credibility of Detective Barry's testimony that he believed the individuals in the files were actual children, based on his training and experience. *See Buccheri-Bianca*, 233 Ariz. 324, ¶ 38 (credibility of witnesses and weight and value of their testimony exclusively within province of factfinder).

¶35        MacHardy contends that computer technology now allows images of actual adults to be digitally modified to appear as children. He therefore maintains that, in the absence of expert testimony establishing that the images have not been so altered, no reasonable juror could find him

---

[5]We note that Detective Barry's testimony also provided the file names of many of the images and videos. To the extent these file names depicted the files as containing minors, e.g., through the use of descriptive terms such as "Lolita's house" and "12 Y-O," such evidence alone would not permit a factfinder to infer the participants were minors, as explained in *Hazlett*. 205 Ariz. 523, n.10.

guilty beyond a reasonable doubt. The parties have cited no Arizona case that squarely addresses this issue, and we are aware of none.[6] However, most federal and state cases addressing this issue since the Supreme Court decided *Ashcroft* have rejected this argument. They have concluded that expert testimony is unnecessary for the factfinder to determine beyond a reasonable doubt that suspect images contain actual minors. *See, e.g.*, *United States v. Pawlak*, 935 F.3d 337, 348-50 (5th Cir. 2019) (images themselves sufficient to authenticate them as depicting actual children); *United States v. Figueroa-Lugo*, 793 F.3d 179, 189-90 (1st Cir. 2015) (juries capable of distinguishing between real and virtual images without expert assistance); *United States v. Kain*, 589 F.3d 945, 950-51 (8th Cir. 2009) (same); *United States v. Lacey*, 569 F.3d 319, 324-26 (7th Cir. 2009); *State v. Clark*, 959 A.2d 229, 231-34 (N.H. 2008) (noting that "the majority of courts that have addressed this issue have ruled" that *Ashcroft* did not establish broad, categorical requirement that expert must testify image depicts actual child); *People v. Brown*, 313 P.3d 608, 615-16 (Colo. Ct. App. 2011) (sufficient evidence included images themselves and supporting testimony from both detective who opined "images did not appear fake" and doctor who focused on physical characteristics of sexual development); *but see State v. Jordan*, 438 P.3d 862, ¶¶ 53-64 (Utah Ct. App. 2018) (in obvious cases, where individuals depicted clearly minors, no expert testimony required, but in close cases, where layperson might not be able to tell whether individual depicted is minor, expert testimony required).[7]

**¶36** MacHardy maintains, however, that advances in technology now allow the creators of pornographic images to digitally alter the appearance of the participants in ways that would be undetectable. As to such images, he maintains, only an expert who has evaluated the coding of

---

[6]*But see State v. Zuck*, No. 2 CA-CR 2019-0130, ¶¶ 7-13 (Ariz. App. May 25, 2021) (mem. decision) (reasoning that, even if trial court erred in providing jury instruction containing language of § 13-3556, any potential error harmless because state provided ample evidence in form of detective and digital forensic examiner testimony, jury inspection of suspect images and videos, and defendant's own admissions).

[7]MacHardy argues that "not a single one" of the cases cited by the state was decided more recently than 2008, and that since that time, "technology has advanced to a point at which distinguishing between real and virtual images is difficult, if not impossible, for a lay person." But as the foregoing citations demonstrate, other more recent cases have held the same.

the file could determine whether an image has been digitally altered. But, MacHardy presented no evidence either at pretrial hearings, or during trial, to support that contention—much less evidence that any such undetectably altered images are in circulation. As our standard jury instructions on reasonable doubt reflect, the state is not required to rule out every possibility of innocence, no matter how speculative, to be entitled to a guilty verdict. Rev. Ariz. Jury Instr. Stand. Crim. 4 (5th ed. 2019) ("There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt."). We therefore conclude the state's evidence, which was comprised of detective testimony, the actual images and videos, and MacHardy's admissions, was sufficient to sustain his convictions.

**Dangerous Crimes Against Children (DCAC) Sentencing Enhancement**

¶37            Finally, MacHardy contends the trial court erred by sentencing him under § 13-705 because the state "failed to present evidence that actual minors were depicted in the materials possessed by [him]." Citing *Wright v. Gates*, 243 Ariz. 118, ¶¶ 17-18 (2017), he argues the state "specifically avowed that the case was not a victim case" and "indicated at sentencing that there is no specific victim impact in the case in terms of known victims." The state argues that the evidence was sufficient to support the convictions and the DCAC allegation, and the court "specifically found that the DCAC allegation had been proven beyond a reasonable doubt."

¶38            In conformity with our prior discussion, MacHardy has failed to show that the victims depicted in the relevant files might have been computer-generated or computer-altered rather than being actual child victims. Although the state did not present expert testimony to support the proposition that the images were not computer-generated, neither did MacHardy present any evidence to substantiate any claim that they were. Thus, drawing all inferences against MacHardy, *id.*, we assume that the images MacHardy possessed and shared involved the exploitation of actual minors.

¶39            MacHardy further complains that "at no point did the state allege, or the trial court find, that any actual minor was depicted in the materials or was harmed as a result of [his] conduct." In support of this argument, he notes that the indictment and DCAC allegation failed to name any "actual victims" and that the state "indicated at sentencing that there is no specific victim impact in the case in terms of known victims." He also

claims the parties' joint May 2020 pretrial memorandum, which the state signed, "specifically avowed that the case was not a victim case."[8]

¶40        Again, we agree with the state that it presented sufficient evidence for the offenses to qualify as dangerous crimes against children for the purpose of sentence enhancement under § 13-705.  The parties agree that there must be "an actual child victim for DCAC enhanced sentences to apply to the enumerated offenses."  *Wright*, 243 Ariz. 118, ¶ 18.  As discussed above, the state presented sufficient evidence that actual minors were shown in the files.  Importantly, in finding MacHardy guilty of all counts in the indictment, the trial court specifically found, based on its own review of the images or the testimony of Detective Barry, that the evidence supported the DCAC allegation beyond a reasonable doubt for each of the nine counts.

¶41        MacHardy also argues that, in essence, the state waived its claim that the sentencing should be enhanced.  To support this argument, he observes that the state "actively indicated" it "did not intend to move forward on the case as a victim case."  In context, however, the state made this statement only to clarify the pertinent "factors for priority in trial date." That document was submitted in response to the trial court's order of April 2020, which noted that the trial had originally been set to occur earlier that month but had been continued due to administrative orders stalling court proceedings due to the COVID-19 pandemic.  The order directed counsel to jointly file the trial memorandum to help the court "determine which cases will take trial priority."   Given this backdrop, we find no basis for MacHardy's claim that he was somehow unaware of the fact that he had been charged with violation of a statute that, under settled law, punishes misconduct involving "actual minors."  *Hazlett*, 205 Ariz. 523, ¶ 17.  To the contrary, the state had provided notice that it would seek sentence enhancement under the DCAC statute in its indictment and DCAC allegation filed in August 2019.

¶42        Finally, MacHardy misrepresents the state's argument at sentencing.   There, the state correctly argued that, although the case presented "no specific victim impact . . . in terms of known victims," "[v]ictimization continues each time these videos and images are spread." It emphasized, therefore, that MacHardy's actions did not constitute "a

---

[8]This purportedly specific avowal arose in the form of an unchecked box on the pretrial memorandum, rather than an affirmative avowal made by the state.

victimless crime." In sum, the state presented sufficient evidence that the illegal images contained actual minors and adequately notified MacHardy that any conviction under § 13-3553 would be subject to sentence enhancement under the DCAC statute. The trial court specifically found that the DCAC allegations had been proven. Thus, we find no reversible error in the application of sentence enhancements under § 13-705 to MacHardy's convictions.

## Disposition

¶43 For the foregoing reasons, we affirm MacHardy's convictions and sentences.

E C K E R S T R O M, Presiding Judge, concurring in part and dissenting in part:

¶44 I concur and join in my colleagues' well-reasoned opinion on all issues but one. The United States and Arizona Constitutions expressly guarantee the right to a jury trial in criminal cases. That right is "fundamental to the American scheme of justice" and "reflect[s] a profound judgment about the way in which [the] law should be enforced and justice administered." *Duncan v. Louisiana*, 391 U.S. 145, 149, 155 (1968). When such substantial constitutional rights are at stake, the state must show that an accused who seeks to waive them has done so knowingly, voluntarily, and intelligently. *See Barker v. Wingo*, 407 U.S. 514, 529 (1972) (expressly referring to right to jury trial, among others, and observing that state bears "the entire responsibility" of showing such waiver); *see also Conroy*, 168 Ariz. at 375 (acknowledging constitutional requirement that waiver of right to jury trial must be "knowing, voluntary, and intelligent"). Accordingly, our rules of criminal procedure require the trial court to "address the defendant personally" to establish that his or her waiver of a jury trial is "knowing, voluntary, and intelligent." Ariz. R. Crim. P. 18.1(b)(2).

¶45 As the United States Supreme Court has repeatedly emphasized, the determination of whether a waiver is voluntary is a distinct inquiry from whether it is knowing and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (inquiry regarding adequacy of waiver of constitutional right "has two distinct dimensions": first, assessment of voluntariness; second, assessment of knowledge and intelligence); *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (same, quoting *Burbine*); *Colorado v. Spring*, 479 U.S. 564, 573-75 (1987) (waiver only valid if both voluntariness and intelligence, separately described, are demonstrated). It has reversed convictions when a court has failed to consider each separately. *E.g.,*

*Edwards v. Arizona*, 451 U.S. 477, 482-87 (1981) (emphasizing that "voluntariness" of waiver and whether waiver is "knowing and intelligent" are "discrete inquiries" and reversing Arizona Supreme Court for failing to separately consider both aspects of waiver).

¶46 The United States Supreme Court has made it equally clear that, in the context of constitutional waivers, "voluntary" is a legal term of art with a very specific meaning.[9] Voluntariness is not established by a showing that the waiver is volitional or intentional—or that the defendant seemed "willing." Rather, a voluntary waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," *Burbine*, 475 U.S. at 421-22, and not be "obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence," *Brady v. United States*, 397 U.S. 742, 753 (1970) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). The Court has universally applied some variation of this standard for assessing voluntariness in the context of constitutional waivers. *Id.* at 749-50 (guilty plea); *Barker*, 407 U.S. at 529 (speedy trial); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227-29, 233 (1973) (consent to search); *Edwards v. Arizona*, 451 U.S. at 483 (right to counsel); *Burbine*, 475 U.S. at 421-22 (rights to remain silent and to presence of counsel); *Spring*, 479 U.S. at 572-74 (same).

¶47 The Arizona Supreme Court has approved use of the same language—probing the presence or absence of coercive pressures or promises—as the proper voluntariness inquiry in the context of the specific constitutional waiver here. Recently, in *Muhammad*, it characterized the trial court's inquiry—which expressly addressed whether the defendant's waiver of jury trial was the product of force, threats, or promises—as part of the "proper personal colloquy" required by Rule 18.1(b). 253 Ariz. 371, ¶¶ 14, 42; *see also Conroy*, 168 Ariz. at 373 (observing that trial judge found defendant voluntarily waived his right to jury trial only "[a]fter learning from defendant that no threats or promises were made to induce him to waive [that] right").

---

[9] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 73-77 (2012) (explaining that courts must read language attentive to specialized meaning of words, and quoting Justice Frankfurter to say: "[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.").

¶48          Thus, long-settled understandings of voluntariness in the context of constitutional waiver, as adopted by the supreme courts of both the United States and Arizona, clarify the correct voluntariness inquiry contemplated by the language of Rule 18.1(b)(2). In this context, the express requirements of that rule—that voluntariness be determined and that the trial court do so by addressing the defendant personally—demonstrate our supreme court's command:   that voluntariness not be assumed from a record wherein its features have not been addressed or explored with the defendant. *See also State v. Baker*, 217 Ariz. 118, ¶ 8 (App. 2007) ("We cannot presume a valid waiver of a jury right based on a silent record."). Rather, the court must conduct a "distinct" inquiry to establish that the waiver is not the product of coercive pressures or promises. *Burbine*, 475 U.S. at 422 (first of "two distinct dimensions" is whether waiver was "voluntary in the sense that it was [not] the product of . . . intimidation, coercion, or deception").

¶49          No distinct inquiry occurred here.   Indeed, as to the definitional features of voluntariness, there was no inquiry at all. As my colleagues correctly observe, the trial court conducted two colloquies with MacHardy. MacHardy also signed a waiver of jury trial form provided by the court. But both colloquies and the form focused exclusively on whether MacHardy understood the difference between a jury trial and a bench trial. By those methods, the court comprehensively itemized the features of a jury trial that MacHardy would forego by agreeing to a bench trial. In sum, the trial court established that MacHardy's decision to waive a jury trial was "knowing and intelligent." But, no part of that inquiry explored—or even obliquely touched on—whether the waiver was made in the absence of any out-of-court pressures or promises.

¶50          The majority contends the trial court had a basis to find a voluntary waiver on this record.   It so contends because MacHardy persistently consented to the waiver through several court appearances involving the two colloquies—and because the court could assess the defendant's demeanor when he did so.[10]  The majority also emphasizes two instances wherein MacHardy arguably acknowledged he was "willing" to

_____

[10]One of the two colloquies occurred during a status conference at which MacHardy appeared telephonically. In that instance, any assessment of demeanor would have arisen exclusively from MacHardy's tone of voice and other auditory cues.

proceed with a bench trial.[11]   And, it observes that MacHardy never affirmatively suggested that his waiver was anything but voluntary.[12]  In essence, my colleagues reason that the court could find a voluntary waiver simply because the defendant, without obvious reluctance, persistently agreed to a bench trial when comprehensively advised of how it differed from a jury trial.

¶51         I cannot join in that reasoning.  It overlooks that defendants may become "willing" to agree to a bench trial—and even persistently consent to one—precisely *because* they have been persuaded to do so by either coercive factors or promises. [13]   By evaluating a defendant's demeanor in answering questions establishing the intelligence of a waiver, an alert trial court might well identify an overtly reluctant defendant.  But we should be far more skeptical that a court can intuit, without inquiring, the nature of the defendant's motivations in willingly consenting to a bench

---

[11]Neither instance provides much insight into MacHardy's state of mind in agreeing to the waiver.  The first use of the word "willing" is found in a form indicating an agreement to a bench trial, generated by the trial court and signed by the state on behalf of both parties, unsigned by either MacHardy or his attorney.  The second involved MacHardy answering, "Yes, I have," to the question of whether he had agreed to a bench trial.  In the predicate to that question, the court observed, *inter alia*, that MacHardy's attorney had said he was "willing to have a bench trial."  In neither case did MacHardy himself use the word "willing."

[12]Given that it is the trial court's duty to establish voluntariness, and that the questions asked by the court here were exclusively leading questions calling for "yes or no" answers, I am skeptical that MacHardy's failure to affirmatively raise any concerns should be given any weight in our analysis.  *See Baker*, 217 Ariz. 118, ¶¶ 10, 13 (inferring constitutionally adequate waiver from defendant's mere presence and failure to object or express concerns "would improperly shift the burden of ensuring an effective jury trial waiver to the accused").

[13] For example, during the inevitable discussion with counsel regarding the strategic implications of choosing a bench trial over a jury trial, unsophisticated defendants can easily misunderstand counsel and erroneously believe they have secured counsel's implicit promises of a more favorable outcome.  *See State v. Donald*, 198 Ariz. 406, ¶ 11 & n.4 (App. 2000) (implicitly recognizing that advice of counsel as to waiver of constitutional rights is not always effective or accurate, and listing numerous cases where such advice has been found deficient).

trial. The voluntariness of a waiver turns on such motivations—not on whether a defendant displays reluctance. *See Baker*, 217 Ariz. 118, ¶¶ 10-11 (rejecting state's contention that "knowing, voluntary, and intelligent waiver" of right to jury trial can be inferred from defendant's mere acquiescence to that decision in open court).

**¶52** Wisely, our rules of criminal procedure require a process that relieves our courts of dependence on such unreliable cues. *See* Ariz. R. Crim. P. 18.1(b)(2)-(3) (requiring trial court to "address the defendant personally" to determine voluntariness and ensure record exists to corroborate that occurred). Instead, the majority opinion renders such a focused inquiry discretionary with the trial court. *See supra*, ¶ 25 (acknowledging proper colloquy "a better practice"). But such an approach both contradicts the mandatory terms of the rule and its manifest purpose to establish clarity. Ariz. R. Crim. P. 18.1(b)(2) (establishing what "the court *must*" do before accepting defendant's waiver of jury trial (emphasis added)).

**¶53** Further, the instant case aptly demonstrates the rule's wisdom in requiring an inquiry to assure the absence of coercive pressures or promises. MacHardy's jury trial had been cancelled at the eleventh hour due to the onset of the COVID-19 pandemic. Jury trials were indefinitely postponed. The trial court could not predict when the COVID restrictions would lift, allowing it to accommodate MacHardy's right to a jury trial. Indeed, to address the pandemic, our supreme court periodically issued orders suspending the enforcement of defendants' state procedural right to a speedy trial.[14]

**¶54** Thus, MacHardy's waiver occurred at a time when the state had strong motivations to prefer bench trials to secure timely convictions, and when MacHardy's actual ability to secure a jury trial in the near future was uncertain at best. The majority is correct that "nothing in the record" demonstrates that MacHardy felt pressured by such circumstances. But it was the trial court's duty under Rule 18.1(b)(2) to establish that coercive pressures or promises were not a factor in his decision to waive. *See Baker*,

---

[14]*See, e.g.*, Ariz. Sup. Ct. Admin. Order No. 2020-60 (Apr. 6, 2020); Ariz. Sup. Ct. Admin. Order No. 2020-70 (Apr. 24, 2020); Ariz. Sup. Ct. Admin. Order No. 2020-75 (May 8, 2020); Ariz. Sup. Ct. Admin. Order No. 2020-79 (May 20, 2020); Ariz. Sup. Ct. Admin. Order No. 2020-114 (July 15, 2020); Ariz. Sup. Ct. Admin. Order No. 2020-143 (Aug. 26, 2020); Ariz. Sup. Ct. Admin. Order No. 2020-177 (Nov. 18, 2020).

217 Ariz. 118, ¶¶ 10, 13 (rejecting state's suggestion that defendant bears burden of ensuring knowing, voluntary, and intelligent waiver of jury trial); *see also Barker*, 407 U.S. at 529 (state bears "entire responsibility" to show waiver of jury trial "knowingly and voluntarily made"). It was not MacHardy's duty to affirmatively raise any misgivings.

¶55 In the absence of any inquiry, we are left to speculate what effect these events had on MacHardy's willingness to waive a jury trial. I would submit that a defendant's inability to secure a jury trial might potentially be a substantial factor in his or her decision to waive one. Remarkably, this "elephant in the room," obviously pertinent to voluntariness, went utterly unexplored. And, it went unexplored as part of a process that requires our trial courts to produce clarity on that very topic. *See* Ariz. R. Crim. P. 18.1(b)(2)-(3).

¶56 Nor does the requirement of Rule 18.1(b)(2)—that the trial court conduct a personal and distinct inquiry with a defendant about the voluntariness of a jury trial waiver—constitute a unique or difficult burden for our courts to bear. Such inquiries as to voluntariness are routine and commonplace in our criminal courts. Most formal criminal charges in our state, and our nation, are resolved by guilty pleas. *See State v. Donald*, 198 Ariz. 406, ¶ 12 (App. 2000) (acknowledging statistics showing that "most criminal cases are disposed of by guilty plea"). To enter a guilty plea, defendants must waive their right to a jury trial, and the voluntariness of that waiver must be determined by the trial court. *See* Ariz. R. Crim. P. 17.1(b), 17.3(a)(2) (court's duty to address defendant personally to determine whether plea is "voluntary and not the result of force, threats or promises"), 17.4(c). As a result, almost every plea agreement, and almost every colloquy in that context, includes an express inquiry whether the defendant's waiver is the result of any out-of-court coercive pressures or promises.[15] Doing so does not require any talismanic words and can be

---

[15] Because Rule 18.1(b)(2) expressly requires our trial courts to inquire directly with defendants whether their jury trial waivers are voluntary, we need not resolve the extent to which that inquiry should parallel the voluntariness colloquy required for a guilty plea. *See Conroy*, 168 Ariz. at 375 (allowing for deviation from guilty plea format in waiver of jury trial context, depending on "particular constitutional right being waived"). As *Conroy* reasoned, there is a logical difference between a jury trial waiver and a guilty plea waiver relevant to how carefully a court must establish the defendant's knowledge of the potential sentencing consequences of conviction. *Id.* at 375-76. A guilty plea directly triggers a sentencing. A jury trial waiver does not. However, *Conroy* makes no

accomplished with two clauses in a single sentence. And, if our supreme court's cases on the topic are representative, our trial courts have routinely been including the proper, terse voluntariness inquiry in the Rule 18.1(b)(2) context. *See, e.g.*, *Muhammad*, 253 Ariz. 371, ¶ 14 ("trial court confirmed [defendant] was not forced or threatened into waiving his right to a jury trial, nor was he promised anything in exchange for waiving this right"); *Conroy*, 168 Ariz. at 373 (trial court ascertained "from defendant that no threats or promises were made to induce him to waive his right" to jury trial); *Butrick*, 113 Ariz. at 565 (trial court asked defendant whether anyone had "tried to force [him] to give up [his] right to a trial by jury" or "made promises to [him] of anything at all to get [him] to give [his] right to trial by jury up").

¶57 The state maintains that no distinct voluntariness inquiry is required to establish voluntariness. It emphasizes reasoning from *Conroy*, reiterated more recently in *Muhammad*, that "[t]he pivotal consideration in determining the validity of a jury trial waiver is the requirement that the defendant understand that the facts of the case will be determined by a judge and not a jury." *Muhammad*, 253 Ariz. 371, ¶ 23 (quoting *Conroy*, 168 Ariz. at 376). That reasoning concludes: "We believe this is all that is required to accomplish the intentional waiver of a known right." *Id.*

¶58 The state takes this reasoning out of context. In neither case had the respective defendants challenged the voluntariness of their waiver. In both cases, our supreme court articulated the above reasoning only when addressing whether the defendant's waivers were knowing and intelligent. *Conroy*, 168 Ariz. at 374-76 (above language used to address state's claim that "defendant's waiver was knowing and intelligent"); *Muhammad*, 253 Ariz. 371, ¶ 24 (addressing whether courts should employ more exacting standard to establish adequacy of jury trial waiver when defendant's competency, the ability to make a knowing and intelligent decision, has been at issue). As articulated above, both opinions expressly endorsed a proper voluntariness inquiry to establish the absence of threats or promises. Of course, Rule 18.1(b)(2)-(3) unambiguously requires that our trial courts evaluate the voluntariness of a jury trial waivers and provide a record of having done so. This belies any suggestion that our supreme court intended, with the above reasoning, to eliminate the need to establish a voluntary waiver.

---

similar distinction between the two waiver contexts in the importance of establishing their voluntariness. *Id.*

¶59 For the foregoing reasons, the trial court failed to establish that MacHardy's jury trial waiver was voluntary. Specifically, it failed to conduct the traditional voluntariness inquiry that has been incorporated and mandated by our rules of criminal procedure. When the record "fails to affirmatively show" that a defendant voluntarily waived his right to a jury trial, we must vacate the defendant's convictions and remand for a new trial. *Baker*, 217 Ariz. 118, ¶ 24. I believe the record compels us to do so here.